FILED IN OFFICE
CLERK SUPERIOR COU
GWINNETT COUNTY

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

2005 AUG 29  PM 2: 34

TOM LAWLER, CLERK

| | |
|---|---|
| MAID OF THE MIST CORPORATION ) <br> and MAID OF THE MIST ) <br> STEAMBOAT COMPANY, LTD., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ALCATRAZ MEDIA, LLC, ) <br> ALCATRAZ MEDIA, INC., and ) <br> WILLIAM M. WINDSOR, ) <br> ) <br> Defendants. ) <br> _____ ) | Civil Action File 5A – 1 0 0 9 7 – 3 |

## COMPLAINT FOR INJUNCTIVE RELIEF

NOW COME MAID OF THE MIST CORPORATION and MAID OF THE MIST

STEAMBOAT COMPANY, LTD., Plaintiffs hereinabove (individually for Maid of the Mist

Corporation, "MOTM" and for Maid of the Mist Steamboat Company, Ltd, "Steamboat" or

collectively, "Maid" or "Plaintiffs"), and file this Complaint against Defendant ALCATRAZ

MEDIA, LLC, ALCATRAZ MEDIA, INC., and WILLIAM M. WINDSOR, (individually,

"Alcatraz I", "Alcatraz II", or "Windsor" or collectively, "Defendants"), and show the Court as

follows:

## PARTIES

### 1.

Plaintiff Maid of the Mist Corporation is a corporation organized under the laws of the

State of New York, United States of America.

BFLO Doc. # 1508190.4
10158596 v1

**2.**

MOTM's principal place of business is 151 Buffalo Avenue, Suite 204, Niagara Falls, New York 14303.

**3.**

MOTM does not transact business in Georgia.

**4.**

MOTM has however been forced to come to Georgia to obtain relief since the Defendants are located here.

**5.**

Plaintiff Maid of the Mist Steamboat Company, Ltd., is a federal corporation organized under the laws of Canada.

**6.**

Steamboat's principal place of business is 5920 River Road, Post Office Box 808, Niagara Falls, Ontario L2E 6V6.

**7.**

Steamboat does not transact business in Georgia.

**8.**

Steamboat has however been forced to come to Georgia to obtain relief since the Defendants are located here.

**9.**

Defendant Alcatraz Media, LLC, is a California limited liability company authorized to transact business in Georgia. Its registered agent and registered address are in Gwinnett County, Georgia, to wit: 3850 Holcomb Bridge Road, Suite 145, Norcross, Georgia 30092.

BFLO Doc. # 1508190.4
10158596 v1

**10.**

Defendant Alcatraz Media, Inc., is a Delaware corporation authorized to transact business in Georgia. Its registered agent and registered address are in Gwinnett County, Georgia, to wit: 3850 Holcomb Bridge Road, Suite 145, Norcross, Georgia 30092.

**11.**

Defendant William M. Windsor is a resident of Georgia and may be served with process at 7675 Ball Mill Road, Atlanta, Fulton County, Georgia.

**JURISDICTIONAL ALLEGATIONS**

**12.**

Upon information and belief, all actions alleged in this Complaint occurred in Gwinnett County, Georgia.

**13.**

Jurisdiction over claims for equitable relief are vested in the Superior Courts of Georgia.

**14.**

Alcatraz I, Alcatraz II, and Windsor are joint tortfeasors.

**15.**

Accordingly, jurisdiction is proper in this Court.

**ALLEGATIONS REGARDING VENUE**

**16.**

Upon information and belief, all actions alleged in this Complaint occurred in Gwinnett County, Georgia.

BFLO Doc. # 1508190.4
10158596 v1

**17.**

In Georgia, venue is constitutional and statutory. See Article VI, § II, ¶ VI of the Georgia Constitution (1983, as amended) and O.C.G.A. § 9-10-30.

**18.**

Venue for Plaintiffs' equitable claims are properly in the Superior Court of Gwinnett County because Alcatraz I and Alcatraz II maintain their registered office and principal place of business in that County.

**19.**

Alcatraz I, Alcatraz II, and Windsor are joint tortfeasors.

**20.**

Actions against joint tortfeasors may be brought in the county of residence of either tortfeasor.

**21.**

Plaintiffs seek substantial equitable relief against the non-resident Defendant, Windsor.

**22.**

Accordingly, venue is proper in this Court.

## FACTS

**23.**

Since 1846, Maid has operated boat tours of Niagara Falls for millions of tourists from around the world.[1]

---

[1] The Affidavit of Christopher M. Glynn (the "Affidavit') is attached hereto and incorporated herein as Exhibit "A."

-4-

**24.**

Maid sells tickets from its box offices in Niagara Falls, New York and Niagara Falls, Ontario and works with tour operators to coordinate ticket sales.

**25.**

The tour operators Maid uses are at Maid's discretion, and the their rights and privileges to sell Maid tickets can be revoked by Maid at any time.

## DEFENDANTS' MAID VOUCHERS CAUSE SIGNIFICANT
## PROBLEMS WITH MAID'S CUSTOMERS

**26.**

On July 29, 2004, Maid accepted Alcatraz I's application for credit and to serve as a tour operator with rights and privileges to sell Maid tickets ("Defendants' Maid Vouchers")[2]. A copy of Maid's letter dated July 29, 2004 is attached as Exhibit 1 to the Affidavit.

**27.**

Upon information and belief, Defendants used the world wide web to sell Defendants' Maid Vouchers to Maid customers who would obtain Maid tickets at Maid's ticket offices when Defendants' Maid Vouchers were redeemed. A copy of Defendants' Maid Voucher for a Maid tour on July 2, 2005 is attached as Exhibit 2 to the Affidavit.

**28.**

Maid would then bill Defendants at the group rate for Maid tickets, which was $9.65 US or $10.70 Can.[3] A copy of Maid's 2005 ticket rate sheet is attached as Exhibit 3 to the Affidavit.

---

[2] Defendants' Maid Vouchers consists of vouchers/e-tickets sold by Defendants that were redeemed by Maid for Maid tours.
[3] The Canadian dollar is approximately worth $0.82 to the United States dollar.

-5-

**29.**

On April 21, 2005, Maid opened its 2005 season and began redeeming Defendants' Maid Vouchers for Maid tickets.

**30.**

However, shortly thereafter, Maid began receiving complaints from its customers regarding the cost of Defendants' Maid Vouchers.

**31.**

Specifically, Maid's customers complained that Defendants' Maid Vouchers were higher than Maid's retail ticket prices and that Defendants' Maid Vouchers did not include additional services or attractions for the additional cost.

**32.**

These complaints were also directed at Maid.

**33.**

In June 2005, Maid learned that on Defendants' web site, Defendants misrepresented Maid's retail ticket prices as costing $18.95 US.

**34.**

Maid also learned that Defendants' Maid Vouchers cost $13.95 US for adults and $12.95 US for children while Maid's retail tickets cost $11.50 US or $13.00 Can for adults and $6.75 US or $8.00 Can for children. See Exhibit 3 to the Affidavit.

BFLO Doc. # 1508190.4
10158596 v1

## MAID GAVE DEFENDANTS MULTIPLE OPPORTUNITIES
## TO RECTIFY THEIR PRICING PROBLEM

**35.**

On June 14, 2005, Maid informed Defendants about its customers who complained that they were overcharged by Defendants. A copy of Maid's letter dated June 14, 2005 is attached as Exhibit 4 to the Affidavit.

**36.**

In addition, Maid informed Defendants that they would no longer be accepting Defendants' Maid Vouchers after June 30, 2005. See Exhibit 4 to the Affidavit.

**37.**

Shortly thereafter, Maid spoke with Defendants' representative and allowed Defendants an opportunity to rectify the pricing problem regarding the sale of Defendants' Maid Vouchers.

**38.**

However, over the next month, Maid continued to receive daily complaints from customers who purchased Defendants' Maid Vouchers at prices higher than Maid's retail ticket prices.

**39.**

Again, these complaints were also directed at Maid.

**40.**

On July 19, 2005, Maid informed Defendants that Maid's customers continue to feel that they were misled and overcharged by Defendants and Maid. A copy of Maid's letter dated July 19, 2005 is attached as Exhibit 5 to the Affidavit.

BFLO Doc. # 1508190.4
10158596 v1

**41.**

Moreover, Maid specifically requested that Defendants state Maid's retail ticket prices and Defendants' service charges on Defendants' Maid Vouchers and gave Defendants until July 27, 2005 to fix their pricing problem. See Exhibit 5 to the Affidavit.

**42.**

On July 29, 2005, after Defendants failed to rectify their pricing problem, Maid requested that Defendants immediately discontinue the advertising and sale of Defendants' Maid Vouchers. A copy of Maid's letter dated July 29, 2005 is attached as Exhibit 6 to the Affidavit.

**43.**

On July 30, 2005, Maid informed its customers that they would no longer honor Defendants' Maid Vouchers that were purchased after July 29, 2005. A copy of Maid's notice dated July 30, 2005 is attached as Exhibit 7 to the Affidavit.

## DEFENDANTS THREATEN MAID AND STATE THEIR INTENTIONS TO CONTINUE TO SELL MAID TICKETS

**44.**

On July 30, 2005, Defendants continued to sell Defendants' Maid Vouchers for Maid tour dates in August, 2005. A copy of Defendants' Maid Voucher with receipt for a tour on August 2, 2005 is attached as Exhibit 8 to the Affidavit.

**45.**

When Maid customers attempted to redeem Defendants' Maid Vouchers for Maid tickets, Maid informed them that Defendants' Maid Vouchers were no longer honored. See Exhibit 7 to the Affidavit.

BFLO Doc. # 1508190.4
10158596 v1

**46.**

These customers became irate and blamed Maid for not accepting Defendants' Maid Vouchers.

**47.**

On August 5, 2005, Maid's counsel informed Defendants that their actions damaged Maid's reputation and goodwill and demanded that Defendants immediately discontinue their advertisement and sale of Defendants' Maid Vouchers. A copy of the letter from Maid's counsel dated August 5, 2005 is attached as Exhibit 9 to the Affidavit.

**48.**

On August 8, 2005, Defendants responded by threatening Maid. A copy of Defendants' e-mail dated August 8, 2005 is attached as Exhibit 10 to the Affidavit.

**49.**

Specifically, Defendants stated "Wouldn't you rather just pay us a seven figure amount and accept that we will be selling Maid of the Mist tickets forever? Write us a big fat check." See Exhibit 10 to the Affidavit (emphasis added).

**50.**

In addition, Defendants stated in their August 12, 2005 e-mail:

> Alcatraz Media has complied and continue [sic] to comply with all terms of the contract with Maid of the Mist. Therefore, Alcatraz Media will continue to sell. Alcatraz Media has no intention of EVER stopping to sell Maid of the Mist tickets. I myself, personally, am busily preparing a new web site that will solely sell Maid of the Mist tickets.

A copy of Defendants' e-mail dated August 12, 2005 is attached as Exhibit 11 to the Affidavit (emphasis added).

-9-

**51.**

Defendants also claimed that they had a contract with Maid, but Maid is unaware of any contract with Defendants. See Exhibit 11 to the Affidavit.

**52.**

Defendants' rights and privileges to act as Maid's ticket agent can be revoked at any time by Maid.

**53.**

As of August 25, 2005, Defendants continue to advertise and sell Maid Tickets and include misleading information about Maid on its web site. A copy of Defendants' web site dated August 10, 2005 is attached as Exhibit 12 to the Affidavit.

**54.**

Specifically, Defendants misrepresent Maid's ticket prices by stating that Maid charges $20.95 US.

**55.**

Defendants continue to offer Defendants' Maid Vouchers throughout the remainder of the 2005 season, schedule reservation times when Maid does not allow reservations, and state that prior dates were "sold out" when, in fact, Maid's tours were not sold out.

**56.**

In addition, Defendants use their web site to encourage Maid's customers, including those who did not purchase Defendants' Maid Vouchers, to file complaints with the Better Business Bureau. A copy of a complaint with the Better Business Bureau dated August 16, 2005 is attached as Exhibit 13 to the Affidavit.

BFLO Doc. # 1508190.4
10158596 v1

**57.**

On August 16, 2005, Maid customer Scott McGrew informed the Better Business Bureau that he "attempted [sic] to contact the company online and they directed me to the BBB. I bought tickets . . . when we visited the park." See Exhibit 13 to the Affidavit (emphasis added).

**58.**

Indeed, Mr. McGrew did not purchase Defendants' Maid Vouchers and, as set forth in their August 12, 2005 e-mail, Defendants are clearly using their web site to direct Maid's customers to file complaints with the Better Business Bureau. See Exhibit 11 to the Affidavit.

**59.**

If Mr. McGrew would have truly contacted "the company," Maid would have addressed and resolved his complaint.

**60.**

Maid is unaware of any complaint ever filed with the Better Business Bureau by Maid's customers.

**61.**

Moreover, upon information and belief, Defendants are not refunding their customers who purchased Defendants' Maid Vouchers that were not honored by Maid. A copy of an e-mail dated August 25, 2005 from a Maid customer who purchased Defendants' Maid Vouchers is attached as Exhibit 14 to the Affidavit.

**62.**

On August 25, 2005, Judie Berry, one of Maid's customers who purchased Defendants' Maid Vouchers, wrote that Defendants left threatening messages on her answering machine in response to her e-mail and telephone messages requesting a refund for her purchase.

-11-

**63.**

Specifically, Ms. Berry wrote that Defendants stated that they were

> going to "come after me." Called me the b---- word. Called me a "lowlife, scumbag, scum of the earth." [Defendants] also stated that [they] hoped I do something against the law, something criminal, so "we can put you in jail."

See Exhibit 14 (emphasis added).

**64.**

Notably, Maid never billed Defendants for Defendants' Maid Vouchers that were not honored.

**65.**

Therefore, by threatening and stealing from Maid's customers, Defendants are damaging Maid's reputation and goodwill.

## COUNT I

### MAID'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF SHOULD BE GRANTED AND DEFENDANTS SHOULD BE ENJOINED FROM ADVERTISING AND SELLING MAID TICKETS AND FORCED TO REMOVE ANY REFERENCE TO MAID ON WEB SITES THEY OPERATE OR PLAN TO OPERATE

**66.**

Paragraphs 1-65 are hereby incorporated by reference as if rewritten in their entirety.

**67.**

Unless Defendants are enjoined from advertising and selling Defendants' Maid Vouchers and are forced to remove Maid from web sites they currently operate or plan to operate, Maid will continue to suffer immediate and irreparable harm and its reputation and goodwill will continue to be tarnished.

-12-

**68.**

The harm suffered by Maid far exceeds any inconvenience that would be caused to Defendants if Defendants continue to hold themselves out as authorized to sell Defendants' Maid Vouchers and use Maid's name and images on web sites that they maintain, use and/or control.

**69.**

Based on Maid's termination of Defendants' right to sell Defendants' Maid Vouchers and Defendants' misrepresentation on its web site regarding Maid's ticket prices, the availability of Maid's tickets, and their ability to sell Defendants' Maid Vouchers, the equities clearly balance in Maid's favor.

**70.**

In addition, it is highly likely that Maid will ultimately succeed on the merits and be granted a permanent injunction enjoining Defendants from advertising and selling Defendants' Maid Vouchers and forcing Defendants to remove Maid from web sites that Defendants currently operate or plan to operate.

**71.**

Maid has no adequate remedy at law.

**72.**

Maid accordingly is entitled to a Temporary Restraining Order and interlocutory and permanent injunctive relief enjoining Defendants from continuing to hold themselves out as authorized to sell Defendants' Maid Vouchers and use Maid's name and images on web sites that Defendants maintain, use and/or control.

-13-

**73.**

Maid is entitled under this Court's powers of equity to interlocutory and permanent injunctions:

a)  Enjoining temporarily, interlocutorily, and permanently any further violations by Defendants including the use of Maid's name on web sites controlled, maintained or used by Defendants;

b)  Enjoining temporarily, interlocutorily, and permanently any further violations by Defendants including the use of images of Maid's boats and/or facilities on web sites controlled, maintained or used by Defendants;

c)  Ordering temporarily, interlocutorily, and permanently that Defendants remove Maid's name and images from all web sites controlled, maintained or used by Defendants;

d)  Ordering temporarily, interlocutorily, and permanently that Defendants stop selling or attempting to sell Defendants' Maid Vouchers; and

e)  Ordering temporarily, interlocutorily, and permanently that Defendants prominently and clearly post a message on web sites controlled, maintained or used by Defendants that they are not authorized to sell Defendants' Maid Vouchers.

## COUNT II

### BASED ON DEFENDANTS' BAD FAITH ACTIONS, MAID IS ENTITLED TO ATTORNEY'S FEES AND COSTS

**74.**

Paragraphs 1-73 are hereby incorporated by reference as if rewritten in their entirety.

-14-

## 75.

Defendants have acted, or failed to act, in bad faith, have been stubbornly litigious and/or have caused Maid unnecessary trouble and expense. Accordingly, Maid is entitled to recover attorney's fees and costs of litigation pursuant to O.C.G.A. § 13-6-11.

## 76.

Maid has attempted to resolve this matter amicably with Defendants and have been met with abuse and/or harassment on the part of Defendants. See Exhibits 10 and 11 to the Affidavit.

## 77.

Maid has incurred attorney's fees and costs prior to filing this Complaint, and as a result, are being forced to bring this lawsuit.

## 78.

Therefore, Maid should be compensated for their reasonable attorney's fees and costs of litigation.

## 79.

**WHEREFORE**, Plaintiffs respectfully request:

(a)     Service of process be issued as authorized by law;

(b)     This Court temporarily restrain and interlocutorily and permanently enjoin Defendants from using Maid's name on web sites controlled, maintained or used by Defendants and using images of Maid's boats and/or facilities on web sites controlled, maintained or used by Defendants;

(c)     This Court require Defendants to temporarily, interlocutorily, and permanently remove Maid's name and images from all web sites controlled, maintained or

-15-

used by Defendants and stop selling or attempting to sell Defendants' Maid Vouchers;

(d)     This Court require Defendants to temporarily, interlocutorily, and permanently post a prominent and clear message on web sites controlled, maintained or used by Defendants that they are not authorized to sell or attempt to sell Defendants' Maid Vouchers;

(e)     The Court order temporarily, interlocutorily, and permanently other specific remediation measures which must be undertaken to restore Maid's business reputation;

(f)     The Court award reasonable attorney's fees and expenses to Maid for having to bring this action; and

(g)     This Court order such other awards and further relief it deems just and equitable.

This _29th_ day of August, 2005.

HAWKINS & PARNELL, LLP

Carl H. Anderson, Jr.
Georgia Bar No. 016320

Attorneys for Plaintiffs

4000 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, Georgia 30308-3243
Telephone (404) 614-7400
Telecopier (404) 614-7500
E-mail: canderson@hplegal.com

BFLO Doc. # 1508190.4
10158596 v1

EXHIBIT "A"