FILED IN CHAMBERS
U.S.D.C. - Atlanta

APR 2 6 2010

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAID OF THE MIST CORPORATION and
MAID OF THE MIST STEAMBOAT
COMPANY, LTD.,

        Plaintiffs

v.

ALCATRAZ MEDIA, LLC, ALCATRAZ
MEDIA, INC., and WILLIAM M.
WINDSOR,

        Defendants

CIVIL ACTION NO.
1:06-CV-0714-ODE

## MEMORANDUM OPINION

This closed civil suit comes before the Court on Plaintiffs'
motions, filed February 19 and March 1, 2010 [Docs. 739 & 741], for an
order finding Defendants in civil contempt for violating the
undersigned's filing injunction entered December 22, 2009 [Doc. 723].[1]
Because this case had been finally adjudicated in a Consent Final
Order and Judgment entered December 9, 2008, and Defendant William M.
Windsor ("Windsor") had persisted in filing large numbers of frivolous
post-judgment motions, the December 22 filing injunction ordered
Windsor not to file "any further motion, pleading, or other paper in
Civil Action No. 1:06-CV-0714-ODE" (the "instant case") [Doc. 723 at
19]. The Court also ordered Windsor not to file in _any_ court "any new
lawsuit which involves claims arising from the same factual predicate
or nucleus of operative facts as the instant case" [Doc. 723 at 19].

---

[1] This Court's conclusions (pp. 39-41 below) finding William M.
Windsor in contempt and modifying the December 22, 2009 order were
orally announced from the bench on Friday, April 23, 2010. The
instant Memorandum Opinion will set forth findings of fact and
conclusions of law.

After the December 22, 2009 order was entered, Windsor filed certain petitions for writs of mandamus in the United States Court of Appeals for the Eleventh Circuit and also filed a new lawsuit in the U.S. District Court for the District of Columbia [Doc. 739-22 to 739-26]. In the District of Columbia lawsuit, Windsor seeks to reopen this closed case and undo its resolution insofar as the Maid of the Mist entities are concerned. In addition, it contains claims for damages against both of the Maid of the Mist entities and a large number of other defendants (including the undersigned) for various acts allegedly wrongfully done or wrongfully not done in connection with this lawsuit or Windsor's nonjudicial complaints.

On March 10, 2010, this Court issued an order to show cause why Plaintiffs' "Motion for Contempt and Sanctions" should not be granted [Doc. 744]. Briefs have been filed by both sides. An evidentiary hearing was held on April 16, 19 and 23, 2010. Windsor testified and made arguments in his own behalf. Having heard the evidence and arguments of the parties, the Court now makes the following findings of fact and conclusions of law.[2]

---

[2]  Once again the undersigned considers  sua sponte  whether to recuse herself from the instant case, and declines to do so. The problem is that Windsor's endless campaign to reopen the case cannot be stopped if a succession of judges handle the case. Because of Windsor's very extensive filings, becoming familiar with the underlying case would require a significant investment of time by a new judge.  This would cause delay and would increase Maid's costs. Also, it is predictable that any rulings unfavorable to Windsor from a new judge would result in a motion to recuse. Because the undersigned is confident that she can be fair to Windsor, and the record clearly establishes a history of repetitive, frivolous pro se filings, the undersigned declines to recuse herself.

## I.    Findings of Fact

William M. Windsor acted as an agent for Defendants Alcatraz Media, LLC and Alcatraz Media, Inc. in the events which led up to the underlying litigation in this case. The Alcatraz defendants were represented by counsel in the underlying litigation; Windsor elected to represent himself. Windsor's adult son, Ryan Windsor, at all times has been the CEO of the Alcatraz defendants. In the instant case, Alcatraz was selling vouchers via the Internet to members of the public who wanted tickets for Maid of the Mist boat rides at Niagara Falls, New York.[3]

In 2005, Windsor and perhaps other representatives of Alcatraz discussed with Maid of the Mist Alcatraz's proposal to sell vouchers to the public. No contract was signed, but the parties established a credit arrangement whereby Maid would reimburse Alcatraz for vouchers. The relationship was soon problematic. A full explanation of the events that caused relations between the parties to unravel is set forth in the Court's order of May 12, 2006 granting Plaintiffs' motion for a preliminary injunction [Doc. 33], and also in the Court's order granting Maid's motion for summary judgment entered August 9, 2007 [Doc. 251].

Maid notified Alcatraz by letter dated July 29, 2005 that it would no longer accept vouchers sold by Alcatraz. Maid's stated reason was that misrepresentations had been made on Alcatraz's website to

---

[3] Sometimes the vouchers were called "e-tickets." The e-tickets were in the form of a receipt. Both the vouchers and the e-tickets could be swapped at Maid's box office in Niagara Falls for a ticket. The swap could only be done on the date of the boat ride at the gate.

consumers that the vouchers were being offered at a discounted, below-retail price. The purchasers were angry when they arrived in Niagara Falls and learned that they had purchased vouchers which were well above Maid's posted ticket prices. Nonetheless, Alcatraz continued selling the vouchers. On August 29, 2005, Maid sought injunctive relief in this action, which was originally filed in the Superior Court of Gwinnett County. It was removed to this Court by Alcatraz on March 28, 2006.[4]

In the course of dealings leading up to this lawsuit, Windsor's conduct toward Maid was contentious and flamboyant. His comments and conduct have been documented in the Court's orders in this case, especially in the order granting the motion for preliminary injunction [Doc. 33] and the order granting Maid's motion for summary judgment [Doc. 251].

The Alcatraz defendants filed counterclaims against Plaintiffs for promissory estoppel, breach of contract, and slander. During a discovery conference on February 2, 2007, the Court questioned Windsor and counsel for Alcatraz about what possible basis they could have for

---

[4] Alcatraz removed the case claiming that it set forth a claim under the Lanham Act; Maid later disavowed this theory. But all Plaintiffs (New York and Canada corporations, with respective principal places of business in New York and Canada) were and are diverse from all Defendants (California and Delaware corporations with principal places of business in Georgia, and an individual Georgia resident), and the matter in controversy (the value of Maid's potentially diminished goodwill) exceeded $75,000, exclusive of interest and costs. The Court discussed this basis for subject-matter jurisdiction in its August 9, 2007 summary judgment order [Doc. 251 at 17]. Injunctive relief was granted to Maid based on its claim of tortious interference with contractual relations, a state-law claim. Maid did not seek damages. No damages were awarded.

their claim that Maid had an obligation to allow Alcatraz to sell vouchers or e-tickets on its behalf. The Court never received a responsive answer to this question. In a brief filed by Windsor on September 17, 2007 [Doc. 268], he claimed that

> Maid and Maid's Attorneys have established a pattern and practice of lies, multiple false sworn testimony at the Preliminary Injunction Hearing, in their depositions, and more. These were material false statements. The Plaintiffs have fabricated the claim upon which they obtained a Temporary Restraining Order and then a Preliminary Injunction.

[Doc. 268, ¶ 11]. When this Court granted Maid's motion for summary judgment, including dismissing the counterclaims on their merits, it granted Maid's claim under O.C.G.A. § 13-6-11 for attorneys' fees and expenses based on a determination that:

> Alcatraz's and Windsor's behavior following Maid's July 29, 2005 termination of Alcatraz's credit authorization was clearly stubbornly litigious. From Mr. Windsor's emails threatening to sue Maid and seeking four million dollars in damages, to the complaints filed with the Attorneys General and Better Business Bureaus, to Alcatraz's treatment of Maid customers who sought refunds for the Alcatraz vouchers they were unable to redeem at Maid's box office after July 29, 2005, the Court finds it was Alcatraz's and Windsor's stubbornly litigious actions that gave rise to this litigation. This is a straightforward, simple case that Alcatraz and Windsor have unduly complicated and prolonged as a result of harboring hostile personal feelings against Maid. It is and always has been obvious that Alcatraz has no right to force Maid to accept it as its agent for ticket sales.

[Doc. 251 at 43-44].

Alcatraz and Windsor appealed the final judgment which granted a permanent injunction against the voucher and e-ticket sales, and which also awarded $421,773.84 in attorneys' fees and other litigation expenses in Maid's favor against Alcatraz and Windsor. On September 19, 2008, the Court's summary judgment order was affirmed; the award of attorneys' fees and expenses was vacated and remanded for

further findings and a fuller explanation as to the amount of the award [Doc. 344]. Apparently, this led to settlement discussions among the parties and, on December 9, 2008, the parties submitted a Consent Final Order and Judgment which settled all claims in the action, left the injunction in place, and called for the payment of $395,000 in attorneys' fees and expenses [Doc. 354]. The settlement agreement recited that attorneys' fees and expenses had been paid. Thus, as of December 9, 2008, the instant action had been fully and finally settled, or at least it so appeared.

The ink had barely dried on the December 9, 2008 settlement agreement when Windsor filed a motion to reopen the case on April 24, 2009 [Doc. 362]. The motion was supported by numerous exhibits, including four declarations of William Windsor with appended exhibits. This filing was comprised of more than five thousand pages. The motion was laced with claims that Maid of the Mist and its lawyers in the instant case committed perjury, filed false pleadings, abused discovery, and deprived Defendants of a fair hearing. Paragraph 49 of the motion to reopen stated:

> Maid withheld documents, fabricated evidence, gave perjured testimony, and abused the legal system in a wide variety of ways. Judge Evans denied the Defendants relief from judgment because she did not stop Maid from committing perjury, withholding documents, fabricating evidence, and perverting the legal system. The actions of Maid and Judge Evans deprived the Defendants of the opportunity to be heard.

The motion also alleged in paragraph 57:

> The Defendants can show that Maid committed fraud, misrepresentation, and perjury, and Maid's attorneys participated knowingly in these wrongs and suborned perjury.

Further, in paragraph 60:

> The Final Judgment in this case should be void because Judge Evans did not act in a manner consistent with due process of law. Judge Evans withheld documents from the Defendants,

denied reasonable discovery to the Defendants, and allowed the legal process to be perverted with all forms of dishonesty by Maid.

The motion to reopen specifically recited reliance on Federal Rules of Civil Procedure 60(b)(1) - mistake, inadvertence, surprise, or excusable neglect; (b)(2) - newly discovered evidence that with reasonable diligence could not have been discovered in time to move for a new trial under Rule 59(b); (b)(3) - fraud; (b)(4) - a void judgment; (b)(5) - the judgment has been satisfied, released or discharged, or applying it prospectively is no longer equitable; and (b)(6) - any other reason justifying relief.

The motion outlined extensively, though in very general terms, assertions of fraud, perjury and corruption by the Maid entities, as well as by Maid's attorneys in this suit, and also alleged that this dishonesty was compounded by the undersigned's mistakes, "who after reading, hearing, and apparently believing the lies of Maid, withheld documents from the Defendants, violated the legal rights of the Defendants by denying the most basic discovery, and acted without the impartiality required of a judge" [Doc. 362, ¶ 1]. Windsor also claimed that incompetent representation by Alcatraz's attorney, who allegedly failed to file important evidence with the Court, undermined Defendants' position in this litigation.

The documents which the Court did not require to be turned over to Alcatraz and Windsor were agreements which Maid had with the Canadian and New York authorities. The Court reviewed these documents in the instant case and directed them to be placed under seal and filed. They were not required to be turned over to Defendants.

Apparently, Windsor later obtained copies of these documents through a public documents request in New York or Canada or both.[5]

The alleged incompetence of Alcatraz's attorney was that he did not file with the Clerk a deposition of one of Alcatraz's employees, which was taken by Windsor. Windsor claimed that it would have established the existence of an oral contract for Alcatraz to sell vouchers during the entirety of the 2005 summer season. Also, Windsor alleges that Alcatraz's counsel negligently failed to file a declaration of Sonya Chase, an employee of Alcatraz who could have testified that Alcatraz refunded money to many customers whose e-tickets were refused by Maid when they arrived at Niagara Falls. Finally, Windsor argued:

> Judge Evans' actions prevented the Defendants from being able to handle this lawsuit as they needed while dealing with dishonest Plaintiffs and dishonest attorneys. This is an unusual and extreme situation where principles of equity *mandate* relief. The "exceptional circumstance" in this case is the totality of the mistreatment of the Defendants.

[Doc. 362, ¶ 73].

On May 22, 2009, the Court denied Windsor's motion to reopen the case [Doc. 390]. This order also denied Windsor's motion for recusal of the undersigned. This order denied Maid's request for an award of attorneys' fees, because the request for award of attorneys' fees was made under O.C.G.A. § 13-6-11 and Fed. R. Civ. P. 37(a)(5), which the Court found procedurally inapplicable. The order's discussion of the merits of Windsor's Rule 60(b) motion noted that "Windsor's arguments

---

[5] Windsor asserts that one of these documents required Maid to limit its ticket prices to rates approved by the public authority. If so, the Court does not see how having this agreement would have been helpful to Windsor. Such a requirement would reinforce the legitimacy of Maid's concern about voucher sales above the approved price.

under Rule 60(b)(3), (4) and (5) are also without merit, as they constitute cursory allegations of dishonesty with no evidentiary support for contentions that the Court should revisit its prior rulings in this case." The Court also found that Windsor's argument under 60(b)(6) merely rehashed his arguments under the other five subsections of Rule 60(b); hence, there was no evidence to support his Rule 60(b)(6) claim.[6]

Beginning on the same date this Court denied the 60(b) motion, Windsor began filing what would eventually total sixty-two motions of various types, including over two dozen motions for hearings and conferences, motions to recuse the undersigned, motions to compel discovery, and motions for sanctions. Maid of the Mist filed a motion for a permanent injunction restricting future filings by William M. Windsor [Doc. 458], numerous motions to strike, and other collateral submissions. In light of the previous order refusing to reopen the judgment, Windsor's motions were dismissed. The Court did consider on the merits Maid's motion for permanent injunction restricting future filings by William M. Windsor. It did grant the motion, finding that "Windsor's persistently litigious behavior undermines the integrity of the Consent Final Order and Judgment submitted by the parties and signed by the Court in this case" [Doc. 723 at 19]. The Court then entered the following injunctive order:

> Accordingly, taking into account that this is a closed case, Windsor, and any parties acting in concert with him or at his behest, are therefore PERMANENTLY ENJOINED from filing any further motion, pleading, or other paper in Civil Action No. 1:06-CV-0714-ODE. Regarding Civil Action No. 1:09-CV-

---

[6] The Court of Appeals dismissed, as frivolous, Windsor's appeal of this Court's denial of Windsor's motion to reopen the case on September 9, 2009.

1543-WSD, the undersigned will take no action on Plaintiffs' injunctive request, because that case is an open matter which is assigned to Judge Duffey.

Finally, Windsor is ORDERED not to file in *any* court any new lawsuit which involves claims arising from the same factual predicate or nucleus of operative facts as the instant case. These claims would be barred by the doctrine of res judicata. The filing of such claims would serve no purpose except to harass Plaintiffs, and would probably result in sanctions against Windsor.

On December 31, 2009, Windsor filed a notice of appeal. The notice of appeal indicated that Windsor was appealing "from the order issued in this action on the 22nd of December 2009 covering a wide variety of issues. The appeal will be based upon violation of Constitutional rights, violations of various statutes (both civil and criminal), and more." Windsor's brief filed in the Court of Appeals on February 22, 2010 argues in Section C, Part 1, that "Judge Evans ordered an injunction against Windsor that is illegal." He states, "Judge Evans has completely foreclosed Windsor's access to the courts, and she acted without jurisdiction in violating Windsor's rights. Her injunction violates the law and Windsor's Constitutional rights" [Brief at 32]. Windsor further argued that he had no warning that an injunction would be issued and that he had no opportunity to be heard on the issue of the injunction [Brief at 33-35]. Notably, Windsor did not file a motion to stay the injunction pending his appeal. Apparently, Windsor's appeal of the injunction-related issues is still pending in the Court of Appeals.

On February 4, 2010, Windsor filed a complaint in the United States District Court for the District of Columbia against the Maid entities, Maid's counsel of record in the instant case, and many other individuals including the undersigned, as described above.

-10-

The D.C. action is a 504-page lawsuit containing 2,935 numbered paragraphs [Docs. 739-21 to 739-28]. It seeks relief against many defendants, including the undersigned, other judges in the Northern District of Georgia, a judge of the United States Court of Appeals for the Eleventh Circuit, plus numerous other public officials in various branches of the federal government. It also seeks relief against Maid of the Mist Corporation, Maid of the Mist Steamboat Company, Ltd., Carl Hugo Anderson, Jr., and Hawkins & Parnell LLP. Anderson and Hawkins & Parnell are Maid of the Mist's lawyers in Atlanta who have handled the underlying litigation. The D.C. complaint was dismissed as frivolous by U.S. District Judge Richard J. Leon on February 14, 2010. Windsor appealed this decision to the U.S. Court of Appeals for the D.C. Circuit; the appeal is pending.

The gist of the D.C. complaint is the following: the judges in the Northern District of Georgia who have handled the instant litigation or other litigation involving claims by Windsor against the Maid of the Mist entities have acted improperly in handling these cases and are probably corrupt. The other government representatives are individuals who Windsor contends should have been responsive to his complaints about the handling of the Georgia litigation but who allegedly were not responsive. Damages were sought against all of the foregoing individual defendants as well as against the Maid of the Mist entities and their attorneys. Windsor asks that the judgment and other rulings in the instant case and in Judge Duffey's case be set aside under Rule 60(d) of the Federal Rules of Civil Procedure.

The complaint begins with a preliminary statement (page 1), followed by a list of the parties and the address at which each may be served. The next section, entitled "Jurisdiction and Venue," sets out

-11-

why the D.C. court has jurisdiction over the case (pages 14-15). Thereafter, an extensive section titled "Factual Background" sets forth Windsor's version of the relevant facts. Paragraphs 70 to 794 (pages 16-98) describe the instant litigation (denominated therein as "Mist I"). This section alleges that agents of the Maid of the Mist entities and their attorneys committed extensive perjury and fraud in this litigation. It also alleges that the undersigned tolerated lies and perjury. It asserts that the undersigned made many errors favoring the Maid of the Mist entities and claims that the undersigned is an unfair and probably corrupt judge for this reason.

The next section, entitled "Deposition Action" (¶¶ 795-1232, pages 99-156), discusses Windsor's efforts to reopen the instant litigation after a judgment was entered in December of 2008.

The next section, titled "Mist II" (¶¶ 1233-1741), describes Judge Duffey's handling of a case assigned to him in which Windsor sued the Maid of the Mist entities, the undersigned, and others. This suit was brought under Rule 60(d), Federal Rules of Civil Procedure, and seeks to set aside the judgment in the instant case.

In paragraphs 1742-2105, entitled "Mist I 2009-2010," the complaint describes Windsor's efforts to set aside the judgment in the instant case, plus his claims that this effort failed due to fraud, perjury, and suspected corruption.

The remaining fact sections of the complaint are paragraphs 2106-2249 (pages 363-396). Thereafter, the complaint asserts thirty-two claims for relief, including two RICO claims (Georgia and federal) based on an alleged conspiracy among all defendants named in the complaint. The complaint further seeks relief based on extension or modification of existing law. The RICO claims are based on thirteen

-12-

predicate acts, including perjury, obstruction of justice, witness tampering, and conspiracy to defraud the United States, among others.

The first claim for relief in the D.C. complaint (page 397) is entitled "Independent Action for Relief from Judgments, Orders and Proceedings and To Set Aside Judgment for Fraud Upon the Courts - FRCP Rule 60(d)(1) and the Court's Inherent Powers." In this section, Windsor asserts that the Maid of the Mist entities, their attorneys, the undersigned, and Judge Duffey committed fraud such that "the judgment, injunctions and orders in the underlying actions must be set aside due to fraud upon the courts pursuant to FRCP Rule 60(d)(1) and this court's inherent powers. Judgments were issued in Mist I that ought not, in equity and good conscience, be enforced" (¶¶ 2279, 2280, page 399). It argues that "the facts in Mist I show very clearly that this is a case of exceptional circumstances" (¶ 2307, page 403).

A major thrust of the D.C. complaint is to set aside the Consent Final Order and Judgment, which Windsor signed in 2008, and to begin the same litigation again.

The D.C. complaint contains all factual elements of the Rule 60(b) motion the Court ruled on in the instant case. The complaint in the D.C. action names Windsor as the plaintiff and the Maid of the Mist entities as defendants, just as the instant case does. The allegations of fraud, perjury and corruption against the Maid entities and their attorneys are very much the same as in the instant case.

On February 19 and March 1, 2010, Plaintiffs filed their motions seeking a finding of contempt and sanctions against Windsor, the Alcatraz entities, Ryan Windsor, and non-party Michelle Thornton based on Windsor's filing of the mandamus petitions and the D.C. lawsuit in violation of the December 22 filing injunction.

-13-

On March 10, 2010, this Court issued an order directing Windsor, the Alcatraz entities, and Ryan Windsor to show cause why they should not be held in contempt as requested in Maid's motion. Maid's brief [Doc. 739-46] argues that Windsor, Alcatraz and Ryan Windsor willfully violated the terms of the December 22 order when the petitions for writ of mandamus were filed and when the District of Columbia action was filed.[7] Maid argued that the Court should assess a fine for the contempt, award Maid its reasonable attorneys' fees for filing and prosecuting its contempt motion, and argued that "if monetary sanctions do not prescribe [sic] Windsor and his accomplices' contumacious behavior, then Maid would ask the Court to incarcerate Windsor pending his compliance." Windsor filed a response on April 2, 2010 [Doc. 749]. In the brief he argued that he had had no opportunity to be heard before the Court issued the December 22 injunction. He made a large number of other arguments, but they are not recited herein as they are irrelevant to the contempt issue which is currently before the Court.

At the contempt hearing which began on April 16, 2010, Windsor orally advanced a number of arguments. These arguments are that the December 22 filing injunction is invalid because (1) it denied him access to the Courts; (2) it was issued without warning and without Windsor having the right to be heard; (3) it is too vague to be enforceable and does not, by its terms, bar the filing of the petitions for writs of mandamus or a new independent lawsuit under Rule 60(d) of the Federal Rules of Civil Procedure seeking to set

---

[7] The Court dismissed the Alcatraz entities and Ryan Windsor from the contempt proceedings at Maid's request, after Ryan Windsor's testimony at the contempt hearing.

aside the judgment and rulings in the instant case; (4) the filing of the lawsuit in the District of Columbia is not barred by the order or by the doctrine of res judicata because it is a new, independent action brought under Rule 60(d) and does not have the same parties or issues as the instant suit; (5) this Court lacks the power to bar Windsor from filing an independent action under Rule 60(d) in the District of Columbia court and from filing petitions for mandamus in the Court of Appeals; (6) because the December 22 order was appealed on December 31, 2009, and is still on appeal, this Court currently has no jurisdiction to enforce the order; and (7) Windsor, a <u>pro se</u> litigant, did not intentionally disobey this Court's December 22 order in filing the petitions for writs of mandamus and the District of Columbia action, even if they were literally precluded by the December 22 order.

Each of these arguments will be considered in turn.

II. <u>Conclusions of Law</u>

    A. <u>Denial of Access to the Courts</u>

Windsor first challenges the filing injunction on grounds that it impermissibly denies his access to the courts.

"Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions." <u>Procup v. Strickland</u>, 792 F.2d 1069, 1073 (11th Cir. 1986) (citation omitted). The only limit that the Court of Appeals "has placed upon injunctions designed to protect against abusive and vexatious litigation is that a litigant cannot be 'completely foreclosed from <i>any</i> access to the court.'" <u>Martin-Trigona v. Shaw</u>, 986 F.2d 1384, 1387 (11th Cir. 1993) (per curiam) (quoting <u>Procup</u>, 792 F.2d at 1074). And,

-15-

as recognized by the Court of Appeals, "[c]onsiderable discretion necessarily is reposed in the district court" in fashioning such injunctions. Procup, 792 F.2d at 1074.

The Court's December 22 order reaches only so far as to limit Windsor's attempts to dredge up this long-closed litigation, and to protect the judiciary and Plaintiffs from Windsor's litigious conduct. Wholly consistent with the portion of the filing injunction limiting Windsor's submissions to other courts, Windsor could initiate a civil action in any court in the country, including this Court, so long as that action did not implicate the same facts and issues of law already decided in the underlying litigation. The Court narrowly tailored its filing injunction to serve the purposes that the injunction aims to serve: bringing finality to the Court's prior orders and judgments and granting Plaintiffs relief from Windsor's continuous filings in a case which was closed, with his consent, nearly eighteen months ago. The Court has "closed the courthouse doors" doors only to the extent necessary to bring finality to this completed litigation and to protect Plaintiffs from the undue burdens of Windsor's inability to accept this case's end.

A key fact makes the filing injunction in this case even more supportable than the filing injunctions imposed in Martin-Trigona and Procup. This case has been completely closed, with Windsor's consent, since December 9, 2008; the Court denied Windsor's motion to reopen this case nearly a year ago; the Court of Appeals dismissed Windsor's appeal from that order as frivolous in September 2009. The filing injunction does not prohibit Windsor from initiating new civil actions unrelated to this closed case. The filing injunction merely protects Plaintiffs and the judiciary from Windsor's continuous attempts to

-16-

rehash questions of fact and law already decided by this Court and the Court of Appeals. Windsor has presented no authority, and the Court has found none through independent research, indicating that a court may not enjoin post-judgment filings related to a closed case to protect the finality of that case's outcome. The filing injunction imposed on Windsor was tailored to serve those ends.

With regard to the portion of the filing injunction limiting Windsor's further submissions in this closed case, Civil Action No. 1:06-CV-0714-ODE, the Court acknowledges that a more prudent course of action may have been to restrict Windsor from submitting motions or other papers without first obtaining leave of the undersigned or the chief judge of this district. But, in practice, that portion of the Court's filing injunction has taken such a shape.

Since the Court entered its December 22 order, Windsor has mailed numerous proposed submissions to the undersigned's chambers for filing with the Clerk of Court. Thus far, notwithstanding the permanent filing injunction, the Court has expressly permitted Windsor to file a notice of appeal from the Court's December 22 order [Doc. 724], a response to Plaintiffs' motion for post-judgment attorneys' fees and expenses [Doc. 731], a response to Plaintiffs' brief summarizing the attorneys' fees and expenses sought [Doc. 742], a response to Plaintiffs' "Motion for Contempt and Sanctions," either on his own or collectively with the other Defendants in this action [Doc. 744], a motion to stay the judgment against him for such fees and expenses, a motion for approval of a supersedeas bond, a Notice of Appeal from the Court's order granting Plaintiffs such fees and expenses [Doc. 758], and an "Emergency Motion for Stay and Motion to Vacate Orders" [Doc. 782]. The portion of the Court's filing injunction limiting Windsor

-17-

from submitting motions or other papers in this closed case, viewed in this light, does not impermissibly limit his access to this Court.

The Court agrees with Windsor, however, that it does not have the power to limit his filings in the Court of Appeals. The mandamus petitions were filed in the Court of Appeals, not in this Court. Moreover, the Court clarifies that, in fashioning the filing injunction in its December 22 order, the Court never intended to enjoin any actions Windsor might take in the Court of Appeals. For that reason, the Court MODIFIES the filing injunction set forth in the December 22 order to clarify that nothing in that order enjoins or otherwise limits Windsor's ability to file notices of appeal in this Court or motions or briefs in the Court of Appeals. Accordingly, Windsor will not be found in contempt for filing his petitions for mandamus relief in that Court.

B.    Denial of the Right to Be Heard

Windsor next challenges the filing injunction on grounds that the Court did not permit him to be heard before enjoining him.

"Procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property or liberty interest." United States v. Powerstein, 185 F. App'x 811, 813 (11th Cir. 2006) (per curiam) (citing Zipperer v. City of Fort Myers, 41 F.3d 619, 623 (11th Cir. 1995)). And "[m]eaningful access to the courts is a right of constitutional significance." Id. (citing Christopher v. Harbury, 536 U.S. 403, 415 & n.12 (2002)). Windsor was thus "entitled to notice and an opportunity to be heard before the court imposed the injunctive order complained of." Id.

Windsor received notice and an opportunity to be heard in opposition to the filing injunction. On July 15, 2009, Plaintiffs

-18-

moved for a permanent injunction on future filings of the type previously discussed. Windsor had an opportunity to respond in opposition to this motion and did in fact respond in a twenty-page brief, with a forty-eight page supporting affidavit, submitted to the Court on August 3, 2009 [Doc. 484].

Moreover, nothing in Windsor's brief indicated what an evidentiary hearing could have possibly revealed. The docket clearly reflected Windsor's history of filing dozens of frivolous post-judgment motions in this closed case, even after the Court refused to reopen the case and the Court of Appeals affirmed that decision. The documents that Windsor filed, and the language used therein, revealed the frivolity of his motions. These filings were in the record and nothing more could have been gleaned from an evidentiary hearing.

C.    The Injunction's Specificity and Detail

Windsor next challenges the filing injunction on grounds that its terms were impermissibly vague and indefinite.

"Every order granting an injunction . . . must: . . . state its terms specifically[] and . . . describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(B) & (C). This rule "serves to protect those who are enjoined by informing them of what they are called upon to do or to refrain from doing in order to comply with the injunction or restraining order." Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531 (11th Cir. 1996) (quotation omitted). "The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." Id. (quotation omitted).

The Court's December 22 order permanently enjoined Windsor, and those acting in concert with him, "from filing any further motion, pleading, or other paper in Civil Action No. 1:06-CV-0714-ODE" [Doc. 723 at 19]. In addition, the Court ordered Windsor "not to file in *any* court any new lawsuit which involves claims arising from the same factual predicate or nucleus of operative facts as the instant case." The order noted that such claims "would be barred by the doctrine of res judicata [and] would serve no purpose except to harass Plaintiffs" [Doc. 723 at 19].

Windsor principally attacks two terms used in describing the filing injunction: "nucleus of operative facts" and "res judicata." The meaning of the term res judicata is irrelevant, though, as that term is not part of the command language of the filing injunction.

The phrase "nucleus of operative facts" is not so specialized as to be incomprehensible to an ordinary citizen. Furthermore, Windsor's intellect and business background convince the Court that he has a good understanding of what that phrase means. His Court filings generally show above-average vocabulary skills and writing and research capability. Windsor knows that the important facts in this litigation originally centered around Maid's claim that Alcatraz had no right to sell vouchers after Maid told them to stop, and Alcatraz's/Windsor's defense that (a) they were contractually entitled to sell vouchers or (b) they were entitled to continue selling vouchers without Maid's consent. This is the litigation Windsor seeks to reinstate. After the final settlement was reached by all parties, Windsor sought through his Rule 60(b) motion to reopen the case and begin his original arguments again. In support of his Rule 60(b) motion, he made sweeping claims of fraud, perjury, corruption and

judicial bias which preceded the settlement agreement, as well as mistake and other grounds. The claims were denied by the Maid entities in their response. The operative facts relating to the 60(b) motion centered around those claims and denials. The Court finds that Windsor understands this. He also understands that the allegations in the D.C. action include, though they are not limited to, these same allegations.

In a case involving several excessively litigious <u>pro se</u> plaintiffs, the Court of Appeals upheld a filing injunction that directed a clerk of court not to accept a complaint unless "it involved claims not arising from the same nucleus of operative fact as those alleged in the underlying § 1983 action or previous actions filed by" the <u>pro se</u> litigants, among other requirements. <u>Dinardo v. Palm Beach County Circuit Court Judge</u>, 199 F. App'x 731, 734 (11th Cir. 2006) (per curiam). In light of this authority, and taking into account the language used in the filing injunction and the party at which the injunction was directed, the Court concludes that the injunction was sufficiently specific and clear.

D.    <u>Whether This Court May Enjoin Filings in Other Courts</u>

Windsor next challenges the validity of the filing injunction by arguing that this Court did not have the power to enjoin Windsor's filings in other courts (the D.C. action) and in the Court of Appeals (the petitions for writs of mandamus).

The Court does have the power to prohibit filings in other trial courts under the specific facts of this case. As stated above, the Court agrees with Windsor that it has no power to enjoin any filings in the Court of Appeals and that its permission is not required for filing a notice of appeal.

-21-

In _Martin-Trigona v. Shaw_, the Court of Appeals cited with approval the injunction issued by the United States District Court for the District of Connecticut in 1983 and affirmed, in pertinent part, by the United States Court of Appeals for the Second Circuit in 1984, deeming that injunction "a reasonable response to the abusive litigation of . . . Martin-Trigona and his allies." _Martin-Trigona_, 986 F.2d at 1387. That injunction, as relevant here, enjoined Martin-Trigona "from filing or attempting to initiate any new lawsuit in any federal court in the United States . . . without first obtaining leave of that federal court." _Id._ (citing _In re Martin-Trigona_, 592 F. Supp. 1566 (D. Conn. 1984)). The Court of Appeals for the Second Circuit affirmed the district court's injunction, despite the effect that the injunction had on Martin-Trigona's ability to file suit in any federal district court, because "[t]he district court is part of the federal judicial system and has an obligation to protect and preserve the sound and orderly administration of justice throughout that system." _In re Martin-Trigona_, 737 F.2d 1254, 1262 (2d Cir. 1984).

The injunction in this case did not require approval of the filing court, unlike the injunction in _Martin-Trigona_. However, in this case (unlike in _Martin-Trigona_), the injunction is limited to filing claims in another court which have _already_ been adjudicated in this Court and affirmed by the Court of Appeals. A major reason for issuing the injunctive order is to keep Windsor from pursuing his vendetta against the Maid entities through relitigation of the instant case, thereby causing them inappropriate trouble and expense. This objective is defeated if a new court, aided by a filing by Maid's attorneys and Windsor, has to determine whether claims in the new case duplicate claims in the old case.

The Court concludes that its injunction properly limited Windsor's ability to file new lawsuits in other trial courts, so long as that limit hinged on those new suits stemming from the same set of facts underlying the closed case before the undersigned. The injunction on Martin-Trigona targeted his propensity to file new, frivolous lawsuits across the country by limiting his ability to do so; the Court's injunction here targets Windsor's propensity to continue rehashing issues of fact and law already conclusively determined by this Court and the Court of Appeals, and the Court concludes that it may limit Windsor's ability to do so elsewhere.

E. Whether This Court Has Jurisdiction While an Appeal Is Pending

Windsor next challenges this Court's consideration of whether Windsor may be held in contempt of the filing injunction when Windsor appealed the December 22 order establishing the injunction on December 31, 2009, and that appeal is still pending.

As a general proposition, "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982).

But this proposition is not absolute. Federal Rule 62(a) carves out an exception to the general Griggs rule, providing that, "unless the court orders otherwise, . . . an interlocutory or final judgment in an action for an injunction . . . [is] not stayed after being entered, even if an appeal is taken." This exception to the general Griggs rule stems from district courts' authority to "maintain[] continuing jurisdiction to enforce a judgment" granting an injunction,

-23-

even while an appeal from that judgment is pending. <u>United States v. Revie</u>, 834 F.2d 1198, 1205 (5th Cir. 1987). "Until [that] judgment has been properly stayed or superseded, the district court may enforce it through contempt sanctions." <u>Id.</u>[8]

This exception makes sense. If the <u>Griggs</u> rule automatically divested this Court of its authority to enforce its December 22 order and hold parties in contempt for violating that order's terms, as

---

[8] <u>See also</u> <u>Howat v. Kansas</u>, 258 U.S. 181, 189-90 (1922) ("An injunction duly issuing out of a court of general jurisdiction with equity powers . . . must be obeyed by them, however erroneous the action of the   court may be . . . . It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished.") (citations omitted); <u>Brown v. Braddick</u>, 595 F.2d 961, 965 (5th Cir. 1979) ("A second threshold question is whether Braddick's notice of appeal deprived the district court of any further power to take action to enforce its order. Since Braddick failed to ask the district court for a stay pending appeal and to post supersedeas bond as required by [Rule] 62(d), the district court retained power to enforce its order by civil contempt proceedings."); <u>Locke v. United States</u>, 75 F.2d 157, 159 (5th Cir. 1935) ("Willful disobedience of an injunction, however erroneous, issued by a court having jurisdiction while such injunction is in force unreversed constitutes contempt of court.") (citation omitted); <u>Turay v. Seling</u>, 108 F. Supp. 2d 1148, 1153 n.2 (W.D. Wash. 2000) ("A contempt finding may be made, and sanctions imposed, while an appeal from an injunction is pending."); <u>Georgine v. Amchem Prods., Inc.</u>, Civil No. 93-0215, 1995 WL 422792, at *6 (E.D. Pa. July 12, 1995) ("Although the filing of an appeal generally divests a district court of its control over those aspects of the case involved in the appeal, courts still maintain jurisdiction for the . . . purpose of enforcing its injunctions."); <u>Vac-Air, Inc. v. John Mohr & Sons, Inc.</u>, 54 F.R.D. 580, 580 (E.D. Wis. 1972) (concluding that, notwithstanding a pending appeal from an injunctive order, district court retained jurisdiction to inquire whether injunction had been violated and whether any party was, as a result, in contempt of court).

Windsor argues, "a person could completely frustrate judicial proceedings by disobeying an order of the Court during the pendency of an appeal without giving any security that it will be complied in the event of affirmance." Blackwelder v. Crooks, 151 F. Supp. 26, 28 (D.D.C. 1957), rev'd in part on other grounds sub nom. Blackwelder v. Collins, 252 F.2d 854 (D.C. Cir. 1958). Unfortunately for Windsor, "[t]he law is not as helpless in that respect" as he might wish. Blackwelder, 151 F. Supp. at 28.

Federal Rule 62(c) permits an enjoined party to move the district court to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights" during the pendency of an appeal from an interlocutory order or final judgment that grants an injunction. But none of the parties—Windsor included—posted a supersedeas bond or otherwise moved the Court to stay the permanent filing injunction imposed by the December 22 order pending Windsor's appeal. Because the Court had jurisdiction to issue that order, and because that order has not been stayed by the Court or duly superseded, the permanent filing injunction imposed by the order was in effect when Windsor filed his lawsuit in the District Court for the District of Columbia in February 2010 and remains in effect today.

The Federal Rules make clear that the permanent filing injunction was not automatically stayed when Windsor appealed the order establishing that injunction on December 31, 2009. Windsor, and any other parties acting in concert with him or at his behest, were thus required to obey that order despite any pending appeal challenging the injunction. And as a corollary to that conclusion, the Court retains jurisdiction to consider whether Windsor, or anyone else bound by the

terms of the injunction, might be in contempt of court for violating the injunction's terms.

F.  Whether Filing the District of Columbia Lawsuit Violated the Injunction

Windsor next argues that the filing of his Rule 60(d) independent action in the District Court for the District of Columbia was not precluded by res judicata and did not violate the terms of the filing injunction that the Court imposed.   As stated above, it is not strictly necessary to examine the doctrine of res judicata to determine whether Windsor violated the filing injunction. The Court need only determine whether Windsor violated the command language of the injunction, which does not include that term, but rather "the same nucleus of operative fact."   Nonetheless, the Court notes that Windsor's stated understanding of "res judicata" is incorrect.

As a general matter, the doctrine of "res judicata" provides "[a]n affirmative defense barring the same parties from litigating a second lawsuit on the same claim, or any other claim arising from the same transaction or series of transactions and that could have been—but was not—raised in the first suit." BLACK'S LAW DICTIONARY 1425 (9th ed. 2009).

The doctrine of res judicata contains two related concepts: claim preclusion and issue preclusion. Issue preclusion generally means "[t]he binding effect of a judgment as to matters actually litigated and determined in one action on later controversies between the parties involving a different claim from that on which the original judgment was based," or "[a] doctrine barring a party from relitigating an issue determined against that party in an earlier

action, even if the second action differs significantly from the first one." BLACK'S LAW DICTIONARY 298 (9th ed. 2009).

The Court of Appeals recognizes several prerequisites to the application of issue preclusion, including

> (1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.

I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1549 (11th Cir. 1986). "Once these requirements are met, issue preclusion is available not only to defend against a demand for relief, but also as offensive support for a demand for relief." CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4416 (2d ed. 2002) (footnote omitted). "Issue preclusion, moreover, is available whether or not the second action involves a new claim or cause of action. If the second action involves the same claim or cause of action as the first, issue preclusion may be called direct estoppel. If a new claim or cause of action is involved, issue preclusion is commonly called collateral estoppel." Id. (internal footnote omitted).

For res judicata, in terms of issue preclusion, to apply, it is not necessary that all of the parties to the first lawsuit be the only parties in the second lawsuit. See id. § 4449 ("The bare fact that other parties were involved in the prior action and are not involved in the later action does not oust preclusion as to parties participating in both actions."). The parties that must be identical are the parties claiming the preclusive benefits of res judicata from the decisions rendered in the first lawsuit and the party against whom

-27-

the preclusive effects of res judicata are claimed in the second lawsuit. Both, or all, of *those* parties must be parties in the first *and* second lawsuits.

Here, Windsor, Maid of the Mist Corporation, and Maid of the Mist Steamboat Company Ltd. are all parties to both the instant case and the litigation initiated by Windsor in the District of Columbia. The mere fact that Windsor included other party-defendants in the D.C. action, or that the D.C. action did not include either Alcatraz entity as a party, does not mean that issues conclusively decided in the instant case have no preclusive effect in the D.C. litigation. The preclusive effects of the res judicata doctrine extend, for the reasons stated above, to any issues fully and fairly litigated by Windsor and the Maid entities in the instant case and conclusively decided by this Court.

The preclusive effects of res judicata also extend beyond the parties to the first lawsuit: "[i]n traditional terminology, it has been said that a judgment is binding . . . on parties and persons in 'privity' with a party." Id. § 4448 (footnote omitted). But to bind non-parties to an issue conclusively decided in a prior round lawsuit, modern courts tend to reject the technical requirement of privity with a party and instead assess "the specific setting [of the case], permitting free review when legal appraisal of the underlying relationships dominates the inquiry." Id. § 4449.

Here, the Maid entities' attorneys are "privies" to Maid and are entitled, by the doctrine of res judicata, to the benefit of the Court's order regarding Windsor's Rule 60(b) motion to reopen. "Generally, there is privity between a non-party and a party in a prior action if the non-party's interests were adequately represented

by a party that had the same interests." <u>Williams v. SunTrust Banks, Inc.</u>, 280 F. App'x 885, 886 (11th Cir. 2008) (per curiam) (citation omitted). The Maid entities' attorneys responded, on their clients' behalf, to Windsor's motion to reopen the case, which indiscriminately asserted claims of perjury, fraud, and discovery abuse against the Maid entities, who were parties to the lawsuit, and the Maid entities' attorneys, who were not [Doc. 362, ¶¶ 18-19, 57]. The Court denied, on its merits, that motion by Windsor, as well as numerous other post-judgment motions that asserted claims against the Maid entities' non-party attorneys, as well as the Maid entities. To the extent that the Maid entities' attorneys benefitted from the disposition of Windsor's motions, which often asserted wrongdoing against them as well as against the Maid entities, the Court concludes that the Maid entities' attorneys bore a sufficiently close relationship to the Maid entities to benefit from the outcome of the motions decided in the Maid entities' favor—and, to the same extent, in the Maid entities' attorneys' favor. For these reasons, the Maid entities' attorneys may invoke the preclusive effects of the doctrine of res judicata in defending against the D.C. action.

Finally, the claims or causes of action asserted in the first and second lawsuits need not be identical for res judicata, in terms of issue preclusion, to apply. For instance, a Rule 60(d) independent action may be precluded by a prior adverse outcome in a Rule 60(b) motion to reopen. Once the court that initially rendered judgment on the merits denies a litigant's Rule 60(b) motion to reopen the case, and the litigant either forgoes an appeal of that denial or that denial survives the litigant's appeal, the litigant may not obtain relief in another district court on the same facts by way of a Rule

60(d) independent action. See Winfield Assocs., Inc. v. Stonecipher, 429 F.2d 1087, 1088-90 (10th Cir. 1970); Locklin v. Switzer Bros., Inc., 335 F.2d 331, 334-35 (7th Cir. 1964), cert. denied, 379 U.S. 962 (1965).

Here, this Court denied Windsor's Rule 60(b) motion to reopen and was never presented with a Rule 60(d) independent action alleging fraud on the courts. Windsor took that claim, which differed only in technical terms from his Rule 60(b) motion to reopen, to the District Court for the District of Columbia. But the technical distinctions between Windsor's previously-denied Rule 60(b) motion to reopen and his Rule 60(d) independent action are immaterial for issue-preclusive purposes. The adverse ruling that this Court rendered in May 2009, on materially similar arguments, issues, and claims for relief that Windsor subsequently made in his Rule 60(d) independent action, precludes the relief that Windsor seeks from the federal courts in the District of Columbia. The causes of action need not be identical for preclusion to apply.

The real question here is whether Windsor violated the command language of the injunction, which prohibited filing a new lawsuit arising from the same nucleus of operative facts. Without a doubt, he did. The allegations underlying Windsor's previously-denied Rule 60(b) motion to reopen in this Court and the allegations underlying Windsor's Rule 60(d) independent action in the District Court for the District of Columbia, to the extent that the independent action pertains to the Maid of the Mist entities, are materially indistinguishable. Both involve broad assertions of fraud, perjury and corruption by Maid and its attorneys. These factual assertions

were rejected by this Court when it denied Windsor's Rule 60(b) motion to reopen in May 2009. This decision was affirmed on appeal.

In sum, Windsor's Rule 60(d) independent action, filed in the District Court for the District of Columbia, violated the filing injunction by rehashing and reasserting claims against the Maid of the Mist entities that this Court previously considered in full and denied on their merits. Those claims arose from the same group of operative facts as claims previously made in the instant case.

G.  Whether Windsor, as a Pro Se Litigant, is Responsible for Violating the Filing Injunction

Windsor implicitly argues that, as a pro se litigant, he should not be held in contempt for violating the filing injunction. The Supreme Court has held that

> [t]he absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act.

McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949) (internal citations omitted). See also Ga. Power Co. v. Nat'l Labor Relations Bd., 484 F.3d 1288, 1291 (11th Cir. 2007) ("Our focus in a civil contempt proceeding is not on the subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue.") (quotation omitted); Smith v. Sullivan, 611 F.2d 1050, 1052 (5th Cir. 1980) (indicating distinction between civil and criminal contempt based on relevance of contemnor's intent to each).

Nonetheless, the Court notes that Windsor clearly possesses greater knowledge, understanding, and analytical ability than the usual pro se litigant. His intellect is well above average. He could

-31-

easily afford counsel, but he prefers to engage in _pro se_ litigation as an avocation. Windsor has achieved significant financial success in various business endeavors and has derived litigation experience from his litigation in a number of courts. Though Windsor's knowledge of the law does not equal that of an attorney, his understanding of legal proceedings is above average for a layperson. His claim that he did not understand the Court's December 22 filing injunction is not genuine. Windsor knew that his conduct in filing his complaint in the District of Columbia was extremely reckless and that the chances were high that he was violating the terms of the filing injunction. Clear and convincing evidence, as described above, shows that Windsor's conduct displayed contempt for this Court.

H.   Attorneys' Fees

The Maid of the Mist entities have moved the Court to award them the attorneys' fees incurred as a result of filing and prosecuting the civil contempt motion and for defending against Windsor's Verified Complaint in the lawsuit initiated in the District of Columbia federal court [Doc. 739 at 37; Doc. 741].

As the Court of Appeals has made clear, "an award of attorney fees to the injured party in a civil contempt case is within the district court's discretion." Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1534 (11th Cir. 1986) (citation omitted). "Indeed, reimbursement to a prevailing movant may include 'expenses reasonably and necessarily incurred in the attempt to enforce compliance.'" Id. (quoting Rickard v. Auto Publisher, Inc., 735 F.2d 450, 458 (11th Cir. 1984)). This rule "provides parties with an added incentive to monitor and enforce an opponent's compliance with a court order by allowing them to recover their expenses in

-32-

exposing noncompliance." Id. at 1535. And merely because an alleged contemnor does not violate a court order willfully does not mean that a district court abuses its discretion by awarding reasonably incurred attorneys' fees against the contemnor. Id.

The Court has reviewed the portions of the Maid entities' motions requesting attorneys' fees incurred as a direct result of (1) bringing the motions for contempt and sanctions and (2) review of Windsor's allegations in the District of Columbia action [Doc. 739 at 31; Doc. 741]. The Court has also reviewed the sworn declarations of Carl H. Anderson, Jr. and the exhibits detailing the attorneys' fees sought from Windsor, all of which the Maid entities attached to their motions [Doc. 739 at 31; Doc. 741]. Maid seeks an award of $5,837.50 for review of the D.C. action and collateral matters, $8,690 for preparation of the contempt motion through February 19, 2010, and $4,482.50 though March 1, 2010.

Upon review of the motions and their attachments, the Court concludes that the attorneys' fees incurred by the Maid entities in bringing their motions for contempt and sanctions are reasonable, based on the prevailing rates charged by comparable counsel for comparable matters in the Atlanta legal market and taking into account the amount of time spent. The Maid entities detailed the specific work done by their Atlanta counsel, parsing out that work per task; all of the work done relates directly to, and was reasonably and necessarily incurred in, the preparation and filing of the Maid entities' motions for contempt and sanctions, which the Maid entities employed in attempts to enforce Windsor's compliance with the filing injunction. Anderson declared that the fees incurred are reasonable in comparison to similar attorneys' rates for legal work done in the Atlanta market,

and the fee rates charged by the Maid entities for work done by the same counsel, and granted by the Court, in this case.

The Court also concludes that the Maid entities reasonably and necessarily incurred the attorneys' fees that they seek from Windsor in preparing to defend against Windsor's allegations in the District of Columbia action. Even though the D.C. action was dismissed on February 14, 2010, counsel's preliminary review of the complaint between February 4 and February 14 was appropriate; it was also necessary to prepare the civil contempt motion. This was a considerable task, given that the complaint is 504 pages long. Also, it was not unreasonable to begin work in preparation for defending against the lawsuit, and the Maid entities' counsel's fees are comparable to rates fees charged in the Atlanta legal market for similar services, as well as comparable to rates sought and awarded to the Maid entities in this case.

## III. Conclusion

For the foregoing reasons, the Court FINDS and CONCLUDES that Defendant William M. Windsor is in contempt of court for filing his "Verified Complaint" in the United States District Court for the District of Columbia against Maid of the Mist Corporation and Maid of the Mist Steamboat Company, Ltd., and its attorneys, Carl H. Anderson, Jr. and Hawkins & Parnell LLP.

Windsor may purge himself of contempt by taking the following actions:

1) move to dismiss with prejudice all claims against Maid of the Mist Corporation, Maid of the Mist Steamboat Company, Ltd. and its attorneys, Carl H. Anderson, Jr. and Hawkins & Parnell LLP, in the action currently pending in the District

of Columbia,[9] and furnish written proof of same to this
Court by May 5, 2010;

2) pay a fine for contemptuous conduct in the amount of
$5,000.00 into the registry of this Court by delivering a
cashier's or certified check to the Clerk of this Court no
later than May 5, 2010;

3) reimburse the Maid entities for the attorneys' fees incurred
in the filing and prosecution of the contempt motions and
for work done on the District of Columbia litigation, in the
total amount of $19,010.00[10], paid by certified or cashier's
check and delivered to Carl H. Anderson, Jr. at Hawkins &
Parnell LLP no later than May 5, 2010.

As stated above, the filing injunction in the December 22 order
was not intended to enjoin Windsor from filing any materials in the
Court of Appeals, and does not require Windsor to obtain the
undersigned's permission before filing notices of appeal of this
Court's orders. The December 22, 2009 filing injunction is hereby
MODIFIED in this regard.

The Clerk is DIRECTED to send a copy of this order by mail to
William M. Windsor at the following addresses:

_____

[9] The United States Court of Appeals for the District of Columbia
Circuit currently has Windsor's appeal of Judge Leon's order
dismissing the case pending before it. The undersigned is aware that
the D.C. Court of Appeals does not have to dismiss Windsor's appeal,
even if he files a dismissal with prejudice. That is within the
discretion of that Court. Nonetheless, Windsor owes the filing of the
dismissal with prejudice to the Maid entities.

[10] This is somewhat less than the amount orally announced in
Court on April 23, 2010.

-35-

3924 Lower Roswell Road
Marietta, GA 30068

P.O. Box 681236
Marietta, GA 30068

The Clerk is also DIRECTED to send a copy to Mr. Windsor's fax, as follows:

Fax: 770-234-4106

SO ORDERED, this 26 day of April, 2010.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE